```
          UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF MISSISSIPPI
                 JACKSON DIVISION
```

JAMES E. SPEED, ET AL.                                PLAINTIFFS

v.                                  CIVIL ACTION NO. 3:04CV909LN

AMSOUTH BANKCORPORATION, AMSOUTH
BANK, AMSOUTH INVESTMENT SERVICES,
INC., AMSOUTH INVESTMENT SERVICES,
INC. OF MISSISSIPPI, AMSOUTH INVESTMENT
MANAGEMENT COMPANY, LLC, JAMES BENSON
MOOREHEAD AND FICTITIOUS DEFENDANTS 1-20             DEFENDANTS

                    MEMORANDUM OPINION AND ORDER

This cause is before the court on the motion of defendants AmSouth Investment Services, Inc., AmSouth Bank, AmSouth Investment Services, Inc. of Mississippi, and AmSouth Investment Management Company, LLC for summary judgment on all of the state law claims of plaintiffs Millard and Elizabeth Woods on the basis that these claims are barred by the statute of limitations.[1] Defendant James Benson Moorehead has joined in that motion. Plaintiffs have responded in opposition to the motion and have filed a cross-motion for summary judgment on their claim for breach of fiduciary duty. Having considered the parties' memoranda of authorities, together with attachments, relative to defendants' motion, the court concludes that defendants are

---

[1] Defendants' motion does not address the Woods' Gramm-Leach Bailey Act and the federal Privacy Right Act claims asserted in plaintiffs' amended complaint.

entitled to summary judgment. It follows that plaintiffs' cross-motion will be denied.[2]

The forty-eight plaintiffs herein filed their complaint in this cause on August 31, 2004 seeking to recover damages stemming from investment losses they directly attribute to alleged misrepresentations by defendant James Moorehead, an investment advisor employed by defendant AmSouth Investment Services (AIS), a registered broker/dealer in the securities business. Their complaint asserts putative causes of action for violation of certain federal statutes, as well as state law claims for fraud, misrepresentation, breach of fiduciary duty, negligence and/or gross negligence, negligent and/or intentional infliction of emotional distress, conversion, invasion of privacy, violation of state securities laws and conspiracy, all of which are grounded on their allegation that Moorehead induced plaintiffs, all of whom were unknowledgeable and unsophisticated in matters of finance and investment, to purchase unsuitable securities based on his misrepresentation that the investments were safe and suitable for their needs, as a result of which they suffered significant losses in their investments. Specifically, plaintiffs allege:

> The Defendants' agent (Moorehead) promised Plaintiffs
> that the securities sold by Defendants were safe
> alternatives to CDs and to interest bearing checking and
> savings accounts and implied or represented that they

---

[2] The court is aware that the plaintiffs have requested an extension of time to March 31st to file their rebuttal on their cross-motion on their breach of fiduciary duty claim. Because the court concludes that the claim is time-barred, a rebuttal memorandum is not required.

were risk-free and/or FDIC insured when, in fact, they were not.  Based upon these representations, the Plaintiffs invested their savings at the direction of these Defendants in risky, non-insured variable annuities, many of which were Defendants' proprietary variable annuities.  The Defendants failed to disclose the various exorbitant commissions, management fees, or other charges involved with these investments.

They similarly allege:

> The Plaintiffs were not informed of the nature of the risk involved with their investment. The Plaintiffs were not advised as to the commissions, custodial fees, surrender charges and management fees involved, were not provided proper disclosures or prospectuses with regard to the investment, and were misled with regard to the variable nature of the product.

Plaintiffs additionally charge that AIS caused or contributed to their losses by its negligence in failing to train and supervise Moorehead, failing to audit its records so that it might promptly discover his misconduct, failing to adequately investigate his misconduct and failing to disclose his wrongdoing to plaintiffs and to state and federal regulatory authorities.

Defendants have moved for summary judgment as to the state law claims of two of the plaintiffs, Millard and Elizabeth Woods, contending that their claims are barred by Mississippi Code Annotated § 15-1-49(1), which provides, "All actions for which no other period of limitations is prescribed shall be commenced within three (3) years next after the cause of action accrued, and not after."[3] Defendants contend that inasmuch as all of plaintiffs' state law claims are based on events surrounding their purchase of the two variable annuities, the statute of limitations accrued at the time of their purchase of those annuities on March 1, 2000. See Stephens v. Equitable Assur. Society of U.S., 850

---

[3] The parties apparently view this as a "test" motion, as they suggest that if the Woods' claims are found to be time-barred, it will likely follow that the claims of the remaining plaintiffs' are likewise barred. The only evidence before the court, however, relates to the Woods' experience.

4

So. 2d 78, 82-83 (Miss. 2003)(stating that fraud claims "accrue[] upon the completion of the sale induced by such false representation or upon the consummation of the fraud"); see also Andrus v. Ellis, 887 So. 2d 175, 179 (Miss. 2004) (holding that statute of limitations on claims of fraud in connection with loan transaction began to run on date loan documents were executed). They conclude that since plaintiffs' complaint was filed well over three years later, it is time-barred. Defendants acknowledge plaintiffs' apparent reliance on the fraudulent concealment doctrine as a basis for tolling the statute of limitations, but submit that it is patently inapplicable. See Miss. Code Ann. § 15-1-67 ("If a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered."). On this point, they contend not only was there no concealment of plaintiffs' cause of action, but that to the contrary, the agreements and accompanying documents signed by plaintiffs at the time of their transaction expressly disclosed loss of principal value as a potential risk of their investment. In addition, they note, plaintiffs were undeniably aware of Moorehead's alleged misrepresentations as early as April 2000 and no later than January 2001, when plaintiffs received account statements showing their accounts had lost principal value.

In response to the motion, plaintiffs take the position that defendants' motion is not well grounded, as it proceeds from the incorrect premise that plaintiffs' claims are based on an allegation that Moorehead guaranteed plaintiffs their principal could not be lost.  The real basis of their claims, they explain, is not that Moorehead guaranteed their principal could not be lost but rather that he placed their money in investments which were unsuitable.[4]  According to plaintiffs, their claim is that defendants should have recommended an investment that was cheaper, more secure, less subject to market fluctuations and more appropriate for their risk tolerance and tax status; and they submit that since nothing that the Woods received, either at the time of sale or thereafter, put them on notice that defendants had not acted in their best interest in giving them faulty advice, their claims are not untimely.

Notwithstanding plaintiffs' protestations, it is clear to the court that, in fact, defendants have not misconstrued plaintiffs' allegations.  Although the complaint does not allege, in these precise words, that Moorehead misrepresented to plaintiffs that their principal was "guaranteed," nevertheless, that is, in effect, what the complaint alleges as the basis for their claims,

---

[4] Plaintiffs state the following in their response brief: The first problem with the Defendants' position is that the Plaintiffs have never asserted that they were guaranteed that they could not lose money in their investment.  This false premise forms the basis for all of the Defendants' misplaced arguments.  Because Defendants' foundation is false, all arguments which rest upon this false premise must also fall.

6

as it charges that Moorehead represented the subject annuities were "safe alternatives to CDs and to interest bearing checking and savings accounts and implied or represented that they were risk-free and/or FDIC insured when, in fact, they were not." That this is the foundational allegation supporting all of plaintiffs' claims is confirmed by Elizabeth Woods' deposition testimony:

> A.  [Moorehead] told us that this account was available, that it was secure, that it was appropriate for people at our age group and our circumstances and that it had a good return record and that he had money invested for his parents, I think it was. . . .
>
> Q.  Okay.  Now, did Mr. Moorehead make any kind of guarantee to you about future performance?
>
> A.  No.  But he more or less insinuated that the principal would be fine, but that the interest, you know, could fluctuate.  It could go up and down.  And I was aware of that, that, you know, the market goes up and down, and your stocks will go up and down.  And so we were aware that there was some risk of the interest or the money being paid to us could fluctuate. But we were more or less assured that the principal wouldn't be touched.
> . . . .
> Q.  One of the primary things that Mr. Moorehead told you that you were concerned about is you wanted to make sure that you were in a safe investment that could not lose the principal value?
> A.  True.
> . . . .
> Q.  Is there something else about that that you're wishing Mr. Moorehead had told you?
> A.  I wish he had told us to run like heck the opposite direction.
> Q.  Okay.  Now, when you say run like crazy in the opposite direction, you're talking about because these investments could -- turns out could lose principal value?
> A.  Yes.

It is thus manifest that the Woods' claims in this case are based on their charge that Moorehead led them to believe that the investments he suggested would not put their principal at risk.

7

At the same time, it is clear that plaintiffs contend that the annuities recommended by Moorehead were unsuitable in view of their "risk tolerance," as plaintiffs insist in their response; but the fact is, their position is that the investments were "unsuitable" because the principal was at risk, and was not "safe" and "secure" as Moorehead had represented.

The Mississippi Supreme Court has held that plaintiffs seeking to rely on the fraudulent concealment doctrine to avoid a statute of limitations bar must prove (1) that the defendant "committed affirmative acts of concealment in order to cover up" the existence of plaintiffs' claims, and (2) that they "acted with due diligence in attempting to discover their cause of action, [but] were unable to do so." Robinson v. Cobb, 763 So. 2d 883, 887–88 (Miss. 2000) (citing Stephens, 850 So. 2d at 83-83). In the court's view, it is doubtful plaintiffs have come forward with sufficient proof as to the first element, and certain they cannot sustain their burden as to the second.

According to the deposition testimony of Elizabeth Woods, she and her husband Millard had moved to the area shortly before the transaction at issue herein and were interested in moving some of their investment accounts from other institutions to AIS, which had a branch office in Eupora. On March 1, 2000, they met with Jim Moorehead to discuss their situation. Mrs. Woods testified that in this meeting, which was their first and only meeting with Moorehead, they explained to him that "we were retired, and that we were getting older. We could not afford to lose money."

8

Moorehead recommended that they purchase two Hartford variable annuities and advised them to place all of their money, totaling $91,282.84, in the AmSouth proprietary equity fund sub-account. Moorehead represented these to be a secure investment and a good choice for the Woods because while it was supposed to have a high rate of return, the principal would not go down.  Mrs. Woods testified that they decided to purchase the annuities based on Mr. Moorehead's recommendation.

Defendants point out that in connection with their purchase of the annuities on that date, plaintiffs were provided numerous documents which disclosed the risk to their principal investment. For example, Mr. Woods signed a Premiere Select IRA Application and Disclosure Statement which recited:

> AIS offers non-deposit investment products that are:
> · Not insured by the Federal Deposit Insurance Corporation (FDIC).
> · Not deposits of, obligations of, or guaranteed by any bank.
> · Subject to investment risk, including possible loss of principal invested.
>
> SECURITIES DISCLOSURE
> You acknowledge that you are aware that securities will fluctuate in value dependent on market conditions. There is no assurance or guarantee that there will be a market for the resale of any securities purchased.
> . . . .
> MUTUAL FUND OR UIT DISCLOSURE
> You acknowledge you have received a copy of the prospectus for this investment which contains complete information, including all fees and expenses. . . . You understand that the value of this investment will fluctuate and, when you sell the shares, the proceeds may be more or less than the original investment and any dividend or interest amount is not guaranteed and may also fluctuate. . . .

Elizabeth Woods signed an AIS Variable Annuity Purchase

9

Authorization Form, which provided in part immediately above her signature:

> Annuities are issued and underwritten by insurance companies that are not affiliated with [AIS]. AIS is acting only as an agent for the Insurance Company and does not guarantee performance by the insurer issuing the annuity. This product is not a deposit, is not an obligation of, or guaranteed by AmSouth Bank or any of its affiliates. This investment is not insured by the FDIC and is subject to investment risk, including possible loss of the principal amount invested.

Plaintiffs also received a Hartford Life Insurance Company Prospectus for the AmSouth Variable Annuity during 2000, which provided, in part, as follows:

> Annuities involve investment risks, including interest rate risk. The market value of the investment may fluctuate, causing possible loss of the principal amount invested.

With specific reference to the AmSouth Equity Income Fund, the prospectus recited:

> Principal Investment Risks
> An investment in the Fund entails investment risk, including possible loss of the principal amount invested. The Fund is subject to market risk, which is the risk that the market value of a portfolio security may move up and down, sometimes rapidly and unpredictably.

Defendants submit that even if plaintiffs were not aware from the disclosures in these documents that Moorehead's representations were false, they certainly knew this when they promptly began receiving account statements showing a decline in their principal balances. A confirmation statement received by plaintiffs less than a month after their investment showed a loss of $3,000 in Mr. Woods' account. Mrs. Woods testified that she

10

and her husband were "shocked" over the loss, but did nothing about it. They "just decided to hold firm right then" and "[t]o see what happened" because they "had been assured" by Moorehead. She testified:

> Q. But would it be fair to say that when you got this statement in, you felt like your assurance had been betrayed?
> . . .
> A. Well, not -- you know, you want to give somebody a chance.
> Q. But I guess what I'm getting at, I thought you said that one of the key representations that Mr. Moorehead said back in March 1st of 2000 was that you could not have your principal go down in value in this account?
> A. That's true. That's what he told us.
> Q. Okay. And this confirmation statement on April 19th (2000) clearly shows you that you've lost principal value of almost $3,000. Is that correct?
> A. True.
> Q. So would it be fair to say that this confirmation statement told you plain and clear that Mr. Moorehead had told you something that really just was not correct?
> . . .
> A. Uh-huh (yes).[5]

The record further reflects that in addition to receiving this initial statement in April 2000, plaintiffs received their year-end statements for 2000 in January 2001, which showed that together, their annuities had lost nearly ten percent of the principal value. Mr. Woods' account had gone down from an initial

---

[5] In arguing that the basis of their claims is the unsuitability of the investment recommended by Moorehead and not any guarantee that principal would not be lost, plaintiffs insist that this series of questions by defense counsel was misleading and ambiguous, and that Mrs. Woods' responses were inconsistent with testimony she had given earlier in the deposition. In the court's opinion, that simply is not the case. Mrs. Woods' testimony was clear throughout that what they needed, and what they told Moorehead they needed, was an investment in which the principal would be protected, and that Moorehead assured them their principal investment would be safe and secure.

11

principal value of $56,575.97 to $50,809.54, and Mrs. Woods' account had lost almost $3,000, going from $34,859.98 to $32,191.42.  It is clear from this that the Woods knew, by no later than January 2001, that their investments could and did suffer significant losses or principal, and yet while they were "upset" and "shock[ed]" that this had occurred, they still did not complain to AmSouth that they had been misled, they did not contact (or attempt to contact) Mooreland for an explanation or to complain of their losses; they did not ask questions of anyone as to why they were losing their principal.  In short, they did nothing.

In their response to defendants' motion, plaintiffs barely acknowledge Mrs. Woods' testimony on this issue or the fact that they knew early on they were losing their principal and yet did nothing to investigate the facts.  Instead, they first insist that their claim is not based on a misrepresentation that they would not lose their principal–a position which the court has already rejected–and they undertake to show that AmSouth and its representatives concealed Moorehead's wrongdoing from plaintiffs. Even assuming there was such concealment, however, which the court concludes there was not, it is an inescapable fact that these plaintiffs knew they had been misled by Moorehead and had suffered losses as a result.

Regarding the question of concealment, plaintiffs explain that in May 2001, unbeknownst to them, Moorehead's employment was terminated after his assistant, Christy Wynne, reported to

12

Moorehead's supervisor that Moorehead had engaged in improper and illegal activity in connection with his sales of investment products, including preparing solicitation materials, prospectuses and other reports which misled potential investors; forging and falsifying thousands of documents; destroying customer records and complaints; and concocting false client financial and tax history. In the wake of his termination, and confronted with investigations by the Mississippi Secretary of State, the Alabama Securities Commission, the National Association of Securities Dealers and the Securities and Exchange Commission, AIS embarked on a scheme to conceal this information from customers, regulators and the general public.  It instructed its employees not to obtain written complaints concerning Moorehead, because such complaints would have to be turned over to regulatory authorities, and it directed that employees stonewall and mislead costumers, and not disclose to them any of Moorehead's wrongdoing.  AIS directed that another AIS representative, Drew Williams, meet with Moorehead's former clients, but according to plaintiffs, it specifically instructed that he not discuss or criticize Moorehead or his investment choices with the clients or inform them of Moorehead's misconduct.

Williams contacted the Woods and met with them during August 2001 to discuss their portfolio, at which time the Woods, with guidance from Mr. Williams, "rebalanced" their portfolio by diversifying their investments in a number of different sub-accounts in order to reduce the risk of future losses.  Plaintiffs have submitted affidavits in which they assert that during their

13

first meeting with Williams, they specifically asked him whether Moorehead had given them proper advice and whether he had placed them in a proper investment, and that Williams assured them they had been given proper advice.[6] They assert that they did not, in fact, actually discover they had an actionable claim until 2004, when national and local media reported on the investigation and findings of the regulatory authorities relating to Moorehead's and AmSouth's misconduct.[7]

Initially, plaintiffs take the position that to establish fraudulent concealment such as would toll the limitations period, they need not establish an <u>affirmative</u> concealment because they were in a fiduciary relationship with defendants and under Mississippi law, because a fiduciary has an affirmative duty of disclosure, silence is deemed the equivalent of an affirmative

---

[6] Plaintiffs report that additionally, he did not tell them that their names had been forged, and that Moorehead had falsified their tax and financial history or anything else negative.

[7] According to plaintiffs, the Mississippi Secretary of State and Alabama Securities Commission assessed $225,000 in fines and penalties against AmSouth, finding, <u>inter alia</u>, that it had failed to reasonably supervise Moorehead; the Mississippi Attorney General's office found that Moorehead had violated numerous provisions of the Mississippi Securities Act by failing to obtain information from clients, misstating material information on client account forms; marking transactions as unsolicited when they were in fact solicited; using misleading hypotheticals and withholding disclosure and risk information from clients; using sales material that contained materially false and misleading information; making unauthorized transactions in client accounts; and recommending and executing unsuitable transactions for his clients. Moorehead was fined and his license revoked, and he was barred for life by the National Association of Securities Dealers.

14

representation. See Turnley v. Turnley, 726 So. 2d 1258, 1262 (Miss. Ct.. App. 1998). Alternatively, they contend that Williams' representation to them that their original investment was appropriate for them is obviously an affirmative concealment that will satisfy this requirement.

The fact is, by their own admission, plaintiffs already knew, prior to their meeting with Williams, that they had been misled by Moorehead. They knew that they had lost a significant amount of their principal balance, and that their principal was not "safe" and "secure" as Moorehead had represented. The statute of limitations began to run when they first knew this (which was within a month of their original investment, but at the latest in January 2001). In the court's opinion, their assertion that months later, after having suffered these losses, Williams failed to volunteer that they could lose money or to otherwise apprize them of Moorehead's numerous wrongs, and/or that they were told by Williams that the original investment was proper or suitable when they already knew it was not, cannot amount to concealment of that which the Woods already knew.[8]

---

[8] The court need not determine whether there was, or may have been a fiduciary relationship, as alleged by plaintiffs, to decide whether there was fraudulent concealment. As regards plaintiffs' allegation of fraudulent concealment, even if Williams (or any of the defendants) was a fiduciary, plaintiffs cannot legitimately rely on his or their failure to disclose what plaintiffs themselves already knew as a basis for reliance on the fraudulent concealment doctrine. Moreover, even if there were a fraudulent concealment by silence on the part of an alleged fiduciary, the Woods cannot escape the consequences of their lack of due diligence. More broadly, even assuming the existence of a fiduciary relationship, plaintiffs' claim for breach of that duty

15

To reiterate, however, even assuming for the sake of argument that this did constitute concealment, plaintiffs failed to exercise any due diligence to attempt to discover their cause of action.  Under the law, "once a person has knowledge of such facts as to excite the attention of a reasonably prudent man and to put him upon guard and thus to incite him to inquiry, he is charged with notice, equivalent in law to knowledge, of all those further relevant facts which such inquiry, if pursued with reasonable diligence, would have disclosed."  First Nat'l Bank of Laurel v. Johnson, 171 So. 11, 14 (Miss. 1936).  See also In re Catfish Antitrust Litigation, 908 F. Supp. 400, 407 (N.D. Miss. 1995) ("The plaintiffs need not have actual knowledge of the facts before the duty of due diligence arises; rather, knowledge of certain facts which are 'calculated to excite inquiry' give rise to the duty to inquire.").  Here, plaintiffs have admitted that when they learned, first in April 2000 and then in January 2001, that they had sustained losses to their principal value, they chose to do nothing.  Mrs. Woods testified, for example, that when they received the April 2000 statement, they "felt like something had gone wrong maybe," but they "were still willing to depend on [Moorehead's] integrity and of the bank, that we felt like it would be straightened out."  Yet they did not ask anyone to straighten it out.  When they subsequently received the year-end statements in January 2001, they obviously knew that nothing had

---

would be time-barred for the reasons stated herein.

been "straightened out," and that more of their principal had been lost. Yet still they did nothing. The most they did, it seems, is to ask Drew Williams, some eight months later, whether their original investment had been proper (when they already knew the answer to that question). In the court's opinion, that cannot reasonably be said to constitute due diligence.

For these reasons, plaintiffs' state law claims, all but two of which are based on their allegation that Moorehead misrepresented that their investment was suitable because the principal was secure, i.e., not subject to loss, are time-barred.[9]

The court recognizes that plaintiffs make additional, related allegations of nondisclosure by Moorehead of certain matters, as they allege they "were not advised as to the commissions, custodial fees, surrender charges and management fees involved..." However, they have admitted that no fees were taken out of their investment funds to pay commissions, and that commissions paid to Moorehead were apparently paid by Hartford for sale of the annuities. There was no duty to disclose the business arrangement

---

[9] This includes plaintiffs' state law claims for fraud, misrepresentation, breach of fiduciary duty, breach of contract, negligent and/or intentional infliction of emotional distress, negligence and/or gross negligence, violation of state securities laws and conspiracy. Though presented as different causes of action, all of these claims, including the claims for breach of fiduciary duty and the claims against AIS for negligent training and supervision, are ultimately grounded on plaintiffs' allegation that Moorehead induced them to purchase securities which put their principal at risk, and all are equally time-barred.
Plaintiffs have asserted two state law claims, for invasion of privacy and conversion, which do not appear to fall readily into this category.

between Hartford and AIS/Moorehead.  See Baldwin v. Laurel Ford Lincoln-Mercury, Inc., 32 F. Supp. 2d 894 (Miss. 1998).  The only fee charged against either account was a $30 annual fee charged against accounts of less than $50,000, and this fee was fully disclosed in the agreements signed by plaintiffs.

Plaintiffs have asserted a claim for invasion of privacy, arguing that AmSouth Bank and AIS shared among each other personal, private or confidential information of the Woods.  However, as defendants point out, plaintiffs have identified no state statute or common law that prohibits such sharing of information between these affiliates, nor do they suggest how they were harmed by any such sharing of information.  This claim therefore fails as a matter of law.  So, too, does the Woods' putative claim for conversion, inasmuch as they have admitted that no property of theirs was converted.

The court is not unsympathetic to the Woods and the situation they were put in by the actions of Moorehead, as perhaps aided by AIS's inaction.  However, the law requires that persons act to pursue and protect their rights in a timely manner, and unfortunately, the Woods failed to do this.  The court must therefore conclude that defendants are entitled to summary judgment on their state law claims.[10]

---

[10] The court does note that in their response brief, the Woods state, "Defendants do not even move for summary judgment regarding broker Williams['] unsuitable investment advice." However, plaintiffs have not sued Drew Williams and have not sued the other defendants for any alleged unsuitable investment advice by Williams.  The original complaint did not even reference

SO ORDERED this 30th day of March, 2005.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE

---

Williams, and the amended complaint merely references Williams' alleged concealment of Moorehead's illegal activities.